UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

                                   Case No. 1:21-cr-50

v.

                                   Hon. Hala Y. Jarbou

VAN GEFFREY WILLIAMS and
JAMAR JOCKESE BLOOM,

      Defendants.

_____/

## **OPINION**

Defendants Van Geffrey Williams and Jamar Jockese Bloom have been charged with possession with intent to distribute cocaine and methamphetamine. They ask the Court to suppress evidence obtained by the Michigan State Police after searching their car at a traffic stop near Benton Harbor, Michigan, on January 25, 2021. Williams had rented the car from Hertz and was driving it before the stop. Bloom was a passenger.[1] A drug detection dog that arrived during the stop alerted to the presence of drugs in the car. A search of the car led to the discovery of cocaine and methamphetamine. The Court held an evidentiary hearing on the motions on July 29, 2021. Trooper Stephanie Lay, who made the traffic stop, testified at the hearing, as well as Trooper Bryon Bierema, who conducted the dog sniff. The Government also presented video of the stop taken from Trooper Lay's vehicle. After reviewing the evidence, the Court will deny Defendants' motions to suppress.

---

[1] As a passenger in the car, Bloom does not have standing to challenge the *search* of the car. He does, however, have standing to challenge the *stop*. *Brendlin v. California*, 551 U.S. 249, 259 (2007). If the stop was improper, then he can ask the Court to suppress evidence arising from it. *See Joshua v. DeWitt*, 341 F.3d 430 (6th Cir. 2003) (applying the exclusionary rule to an improper traffic stop).

## I. FACTS

Trooper Lay is part of a "hometown security team" whose primary goal is traffic safety and traffic enforcement.  At the time of the traffic stop, she had been employed by the Michigan State Police for over four years, and had been a member of the hometown security team for over two years, making about 15 to 20 traffic stops per day.  She typically patrols I-94 in Berrien County, Michigan.  On the morning of January 25, 2021, she was inside her cruiser, parked along the highway.  She and other members of her team, including Trooper Bierema, had been assigned to patrol a 10-mile stretch near the Van Buren County line, about 35 miles from Indiana.

Shortly before 10:20 am that morning she was parked in the median observing traffic on I-94.  She saw a black Chevy Tahoe driving dangerously close to a truck in front of it, in violation of Mich. Comp. Laws § 257.643, which prohibits following another vehicle "more closely than is reasonable and prudent[.]"  *Id.*  She let the car pass and continued to observe it.  The driver did not correct his violation, so she drove onto the highway to catch up with the car.  After she got close enough to observe the license plate, she ran a check on it.  She learned that the car was a rental vehicle that had been in Houston, Texas, the previous morning.  She activated her lights and pulled the car over.

Video from Lay's cruiser shows that she pulled over behind the Tahoe on the shoulder of the highway.[2]  Lay exited her cruiser and approached the Tahoe on the passenger side.[3]  Williams was in the driver's seat.  Bloom was in the passenger seat.  As she approached, Bloom gave Lay his driver's license without being asked to do so and without making eye contact, which Lay thought was unusual.

---

[2] This occurred around the two-minute mark in the video.  The Court will use that mark as the start of the stop.

[3] Lay explained that she chose the passenger side for her safety.  She did not want to risk being injured by a passing vehicle.

2

Lay asked Williams for his driver's license and insurance.  Williams gave Lay his driver's license and the rental agreement for the car.  Lay then asked Williams to step out of the car because she could not hear him from the other side due to the sound of the wind and traffic.  Williams did so.  Lay suggested that he sit in the front seat of her cruiser to stay warm while she checked his information.  He declined to do so, saying, "I'm fine."  Williams thought that response was unusual because only one other person stopped at a traffic stop had ever refused the invitation to sit in her cruiser.  As Williams leaned on the hood of her cruiser, Lay asked him where he and Bloom were coming from.  He replied that he was on his way to see his father in Detroit after a vacation in Indiana.  Lay again asked him where he was coming from and he said, "Indiana."  She asked him what he was doing in Indiana and he gave her his business card, telling her that he was a laborer, which seemed inconsistent with his assertion that he had been on vacation and struck her as an attempt to deter her from asking further questions.  He also became defensive, questioning why she was asking so many questions.

Lay went back inside her cruiser and spent several minutes running Defendants' information through law enforcement databases.  Williams's information did not turn up anything noteworthy.  Bloom's information turned up an "officer safety caution," which meant that he had been arrested in the past for a crime.  Lay also learned that Bloom was on probation.  While Lay was checking Defendants' information, Trooper Bierema arrived with his drug detection dog. Trooper Bierema arrived initially to back up Trooper Lay.

Lay completed her database searches about seven minutes into the stop and then walked back to the Tahoe to ask Bloom questions related to his probation.  She asked him where he was coming from.  He was not very specific.  He told her that he had come from "somewhere around the Indiana-Michigan" border.  She asked where he was headed and he stated that he was going

3

home to Saginaw.  He also said that he intended to stop in Detroit to visit his aunt.  These plans were different from what Williams had said.

Around nine minutes into the stop, Lay walked back to where Williams was standing in front of her cruiser.  She asked him where he had picked up Bloom and whether Bloom had traveled with him through Indiana.  He would not answer those questions.  He said that he could not speak for Bloom.  Lay confronted him with the fact that his rental car had been in Texas the previous day even though he said he had been on vacation in Indiana.  He repeated his assertion that he had been on vacation and then claimed that he previously told her that he was "coming from" Indiana.

About twelve minutes into the stop, Lay asked Williams for consent to search the car.  He refused.  She had him stand away from the car to allow for a canine sniff around the exterior. Trooper Bierema began the sniff about fourteen minutes into the stop.  After about two minutes of sniffing and walking around the car with Bierema, the dog alerted to the presence of drugs. Troopers Lay and Bierema then searched the car and discovered two leather gym bags in the back seat containing a total of 3 kg of cocaine and 2 kg of methamphetamine.  They then arrested Defendants.

## II. Law

Defendants argue that their detention violated their Fourth Amendment rights.  A traffic stop that is "lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).  A traffic stop "must . . . last no longer than is necessary to effectuate the purpose of the stop," and "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983).  Police officers, generally speaking, may not prolong a traffic stop

"beyond the time reasonably required to complete the mission of issuing a ticket for the violation" and to "attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 350-51 (2015). "Authority [to continue the stop] ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* at 354. Thus, a traffic stop violates the Fourth Amendment "if it is prolonged beyond the time reasonably required" to issue a ticket. *Id.* at 354-55.

As part of a traffic stop, officers may "check[] the driver's license, determin[e] whether there are outstanding warrants against the driver, and inspect[] the automobile's registration and proof of insurance." *Id.* at 355. They also may order a car's occupants to step out of the vehicle. *Pennsylvania v. Mimms*, 434 U.S. 106 (1977). In the course of completing these tasks, officers may investigate matters unrelated to the traffic stop *if additional suspicion arises* from the encounter, *Rodriguez*, 575 U.S. at 355, or if such inquiries "do not measurably extend the duration of the stop," *Arizona v. Johnson*, 555 U.S. 323, 333 (2009).

In other words, once an officer completes, or reasonably should have completed, the normal tasks associated with the purpose of the traffic stop (e.g., gets the driver's information, checks for warrants and proof of insurance, and issues a ticket), the officer cannot *prolong* the stop to investigate other criminal activity, *unless* the officer learns new information that gives "reasonable suspicion and articulable suspicion that criminal activity is afoot" so as to justify further detention. *United States v. Lott*, 954 F.3d 919, 923 (6th Cir. 2020).

"Reasonable suspicion requires more than an 'inarticulate hunch,' but less evidence than what is necessary for either a probable-cause or preponderance-of-the-evidence standard." *United States v. Pope*, Nos. 20-5866/5868, 2021 WL 1383250, at *4 (6th Cir. Apr. 13, 2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 22 (1968)). In forming reasonable suspicion, officers may draw on their

"experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)).  The Court "cannot determine that an officer had reasonable suspicion on the basis of a factor on which the officer did not actually rely."  *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002); *accord United States v. Mendoza-Ricardo*, 815 F. App'x 970, 976 (6th Cir. 2020).

Prolongation is a fact-specific inquiry.  The Court must consider the totality of the circumstances surrounding the stop.  "Context-framing" questions, such as the driver's "travel history and travel plans" as well as the driver's "authority to operate the vehicle," are generally acceptable and will "rarely suggest a lack of diligence" by the officer because those questions may help explain or put into context the driver's conduct.  *United States v. Everett*, 601 F.3d 484, 494 (6th Cir. 2010).

A dog sniff by a trained narcotics dog does not itself require a warrant or reasonable suspicion because it does not implicate Fourth Amendment concerns.  *United States v. Winters*, 782 F.3d 289, 297 (6th Cir. 2015).  But it is improper if it measurably extends the duration of a traffic stop without reasonable suspicion to justify that extension.  *See Rodriquez*, 575 U.S. at 357; *United States v. Salas*, 820 F. App'x 405, 412 (6th Cir. 2020) ("An ordinary traffic stop . . . cannot be extended to accommodate a dog sniff without reasonable suspicion of criminal activity.").

### III. Analysis

#### A. Duration of Stop

The Government initially argued in its brief that the stop was reasonable in duration because the dog sniff started only fourteen minutes after the initial stop began and ended just a few minutes later.  (Gov't's Br. 10, ECF No. 62.)  According to the Government, it would have taken

Lay more time to complete the ticket, so the entire duration of the stop up to the point that the dog alerted to the presence of drugs was reasonable.

It is difficult, however, to measure the reasonableness of the duration of a stop in the abstract. The Court must consider the totality of the circumstances. There is no set amount of time for how long a traffic stop should last. Moreover, there is no evidence here indicating how long it would have taken Trooper Lay to complete the stop. She never testified about that. Moreover, at some point before the dog sniff, she abandoned the original purpose of the stop altogether. She testified that she could have issued a ticket after checking Defendants' driver's licenses, but she did not do so. Instead, she posed more questions to Defendants and later assisted Trooper Bierema with the dog sniff and the subsequent search of the vehicle.

If Defendants were forced to wait so that Lay could pursue investigations outside the scope of the traffic stop, or so that Trooper Bierema and his dog could complete the sniff around the car, then Defendants' Fourth Amendment rights may have been violated. Put simply, if Trooper Lay reasonably could have issued a ticket or completed the ordinary tasks associated with the traffic stop *before the dog alerted to the presence of drugs*, then Defendants' detention was likely unconstitutional unless reasonable suspicion supported extending the duration of the stop.

### B. Reasonable Suspicion

The Government argues that reasonable suspicion warranted an extension of the stop beyond its original purpose. Trooper Lay testified that she relied on the following facts to support reasonable suspicion of criminal activity: (1) Williams's statement that he had been vacationing in Indiana seemed inconsistent with the rental records for their car, which showed that it had been in Houston the previous morning; (2) Defendants were traveling from a "source state" for narcotics (Texas) to a "destination city" (Detroit); (3) I-94 is a "known drug route"; (4) if Defendants were traveling to Detroit as Williams claimed, they were two hours off track from the most direct route

between Houston and Detroit; (5) Defendants were using a rental vehicle, which is what drug traffickers tend to do to prevent the seizure of their own assets; (6) Williams gave vague and evasive responses to questions (telling her that he had been vacationing in Indiana, without saying where, and giving her his business card when she asked again about his travel); (7) Bloom did not make eye contact when giving her his identification; (8) Defendants' statements about their travel plans were inconsistent with one another; (9) Williams's behavior changed during her questioning; and (10) Lay saw that Williams possessed two cell phones.

In addition, Lay testified that when she encounters someone on probation, she typically asks them additional questions about the terms of the probation, to make sure that they are in compliance and to inform them that they need to tell their probation officer that they had contact with law enforcement.

At seven minutes into the stop, Lay had arguably completed almost all of the tasks associated with the traffic stop. She had obtained Defendants' driver's licenses and the rental agreement from the vehicle and checked them against police databases. These were ordinary inquiries incident to a traffic stop. *See Rodriguez*, 575 U.S. at 355. She had also asked Williams about his travel plans and travel history. These "context-framing" questions were also acceptable as part of the traffic stop. *See Everett*, 601 F.3d at 494. Thus, at that point, there was no measurable extension of the traffic stop beyond its original purpose. What remained was for her to issue a citation or let Defendants proceed on their way.

But by that time, she had learned sufficient facts to give reasonable suspicion to detain Defendants for further inquiry. The first seven facts listed above were all known to her. Most suspicious was Williams's explanations of his travel history. His vehicle had been in Houston the previous day but he repeatedly claimed that he had been vacationing in Indiana or was coming

from Indiana.  The Sixth Circuit has repeatedly indicated that "dubious travel plans" can be a "strong indicator[] of criminal activity." *United States v. Howard*, 815 F. App'x 69, 77 (6th Cir. 2020) (quoting *United States v. Calvetti*, 836 F.3d 654, 667 (6th Cir. 2016)).  It can suggest that the driver is "hiding the true nature of [his] trip." *Id.* at 78.  "This factor is more likely to give rise to reasonable suspicion when inconsistent explanations are offered, when other circumstances contradict the driver's or passengers' explanations, and when the driver or passengers are ignorant without justification of the details of their own itinerary or plans[.]" *Id.* at 77-78 (citations and quotation marks omitted).  Here, Williams's statements seemed to contradict the records for his vehicle.  Add to that the unusual route that Defendants were taking from Houston to Detroit, and Williams's evasive responses and defensiveness when prodded about his travel history.

Some of Defendants' conduct, like refusing to enter Lay's vehicle, not making eye contact, or defensiveness, might be attributable to nervousness, which is an "'an unreliable indicator, especially in the context of a traffic stop.'" *United States v. Stepp*, 680 F.3d 651, 665 (6th Cir. 2012) (quoting *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004)).  But they are also factors that Lay could consider in the total mix.

Defendants' use of a highway like I-94 is not particularly indicative of drug trafficking or any other criminal activity.  Similarly, Defendants' use of a rental car and apparent travel from Houston to Detroit do not seem particularly suspect, but the Court acknowledges that Trooper Lay's training and experience give her special insight into the sources, destinations, and means for drug trafficking.  These are weak factors that added some weight to her suspicion.

At the very least, the foregoing factors, along with Bloom's probation status (which presumably limited his ability to travel outside Michigan), gave Lay sufficient reason to inquire further about Defendants' travel itinerary.  The car's rental records and Williams's assertion that

9

he was coming from Indiana indicated that Bloom may have traveled outside Michigan, a possible violation of his parole.  As she dug deeper, she discovered more reasons to be suspicious.  Bloom indicated that he was traveling to a different location than Williams and did not provide a specific location about where Williams supposedly picked him up.  His response that Williams picked him up "near the Michigan-Indiana border" is suspect because it was vague and it was probably the farthest location he could identify while still being within the presumed limits of his probation conditions.  And when Lay returned to Williams to get more clarity on the issue, Williams would not respond.  He would not answer a simple question about whether Bloom had been in Indiana.  Also, when Lay attempted to learn why Williams would say that he had been vacationing in Indiana when his vehicle had been Houston, he seemed to change his story rather than provide a straightforward explanation.

In short, all the facts gathered by Trooper Lay by the time she finished checking Defendants' licenses and information from inside her cruiser were sufficient to detain Defendants to inquire further about their travel history.  She had grounds to suspect a possible parole violation, if not more.  And those facts, combined with what she learned after further inquiry, were sufficient for Lay to detain Defendants for a few more minutes to allow Trooper Bierema to conduct the dog sniff around their car.

Defendants point to *United States v. Townsend*, 305 F.3d 537 (6th Cir. 2002), in which the Court of Appeals upheld the suppression of evidence obtained at a traffic stop because the officers prolonged the stop to obtain a canine sniff without reasonable suspicion.  There, the officers had relied on ten factors to support their suspicion, but the district court found these factors were too weak:  (1) the driver raised his hands as officers approached and was "unusually cooperative," but these actions were not suspicious; (2) the two defendants purportedly told inconsistent stories

about their travel plans, but in fact both defendants claimed they were travelling from Chicago to Columbus and there was nothing suspicious about that; (3) the officers believed the trip was from a "source city" for narcotics, but a trip between Chicago and Columbus, "two large, mutually proximate Midwestern cities," is common and is not suspicious; (4) the presence of three cell phones in the car, but this provided only "weak" support for criminal activity because cell phones are common; (5) the presence of a Bible in the car, but this was also "weak"; (6) the police claimed they felt "rolls" of currency in the defendants' pockets during a pat-down, but the police never ascertained how much money the defendants were actually carrying; (7) one defendant had been previously *arrested* for a weapons charge, but a prior arrest (as opposed to a conviction) carried little weight; (8) the officers said the defendants appeared nervous, but the district court found that this testimony was not credible; (9) the interior of the car was cluttered with food wrappers and clothing, but an unkept car is not suspicious; and (10) the driver was not the record owner; however, this was weak because the driver was listed on the insurance and the owner was the driver's mother.

*Townsend* provides little help to Defendants in this case.  To be sure, there are some similarities between that case and this one:  Bloom's nervous and/or unprompted cooperative behavior is similar to that of the defendant in *Townsend*.  And as in that case, those facts provide weak support for reasonable suspicion.  Also, Defendants here were purportedly travelling in a drug corridor like the defendants in *Townsend*, which did not lend much weight to reasonable suspicion in that case because highway travel is common.  A trip from Houston to Detroit over the course of a day or so is more unusual than a trip between relatively close cities like Chicago and Columbus, but even so, that factor does not provide much weight.  More importantly, Williams'

11

dubious and evasive explanations for his past travel were suspicious in light of the rental records for his car.  No similar facts were at issue in *Townsend*.  Thus, *Townsend* is distinguishable.

### IV. PROBABLE CAUSE TO ARREST BLOOM AND SEARCH HIS EFFECTS

Bloom also contends that the Government lacked probable cause to search his "personal effects," including his "luggage and/or cellphone(s) and/or the contents subsequently derived from them," because the police lacked probable cause to arrest him.  (Bloom's Br. 2-3, ECF No. 57.)  Bloom notes that he was not the driver or owner of the vehicle.  He contends that his mere proximity to the drugs in the car did not render him in possession of, or otherwise responsible for, them.

The Government rightly responds that the question of probable cause for the arrest was established by the grand jury.  In other words, Bloom's presence in a car with two suitcases in the back seat full of drugs was sufficient to establish probable cause for the police to arrest him.  The question whether he possessed those drugs or is otherwise responsible for them is an issue for the jury to decide.

To the extent Bloom challenges the officers' search of his luggage, his argument is faulty because the officers obtained probable cause to search the inside of the car based on the dog alert.  "An alert by a properly trained and reliable drug-detection dog is sufficient to establish probable cause for the presence of a controlled substance."  *United States v. Stubblefield*, 682 F.3d 502, 507 (6th Cir. 2012) (quotation marks omitted).   And "[i]f the police have probable cause to search a lawfully stopped vehicle for contraband, then the police have probable cause to search every part of the vehicle and all containers found therein in which the object of the search could be hidden."  *Id.*  Accordingly, the officers had probable cause to search the luggage in the back seat of the car in which the drugs were found.

## V. CONCLUSION

In short, the Court will deny Defendants' motions to suppress evidence because they failed to show that their Fourth Amendment rights were violated.  An order will enter consistent with this Opinion.

Dated:   August 9, 2021                          /s/ Hala Y. Jarbou
                                                 HALA Y. JARBOU
                                                 UNITED STATES DISTRICT JUDGE